UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

Troy G. Hammer,
            Plaintiff,

v.                                          Case No. 20-CU-202


Christopher Bortz, et al.,
            Defendants.

_____

PLAINTIFF'S  BRIEF  IN  OPPOSITION  TO  DEFENDANTS'
   MOTION  FOR  SUMMARY  JUDGEMENT

_____

INTRODUCTION

The Court allowed plaintiff Troy Hammer (Plaintiff), a then
inmate at Columbia Correctional Institution (CCI), to proceed
on an Eighth Amendment excessive force claim against Correctional
Officer Christopher Bortz (Bortz), alleging that on November 6th,
2018, while Plaintiff was fully subdued and secured in the restraint
chair, Bortz used excessive force by placing Plaintiff in a
"pressure point" hold without adequate warning prior to or any
logical justification for such force, other then to cause the

1

"unnecessary and wanton infliction of pain." The Court also allowed Plaintiff to proceed on an Eighth Amendment failure-to-protect claim against Correctional Supervisor Christopher Olson (Olson), alleging that Olson failed to intervene to stop the "unnecessary and wanton infliction of pain" by Olson's subordinate officer's excessive force. (Plaintiff Proposed Findings of Additional Fact ((PPFAF) ¶¶ 1-2.) However, defense counsel is conspiring in the fabrication of Defendants' testimony with their legal expertise, by simply exaggerating the need for force under such circumstances, exaggerating Plaintiff attempting to free himself from multiple forms of restraints (physically impossible circumstances), exaggerating Plaintiff's refusal to comply with several directives prior to the use of force, and ultimately exaggerating the threat Plaintiff posed to officers' safety, let alone his own while fully subdued and secured in multiple forms of restraints.

Prison security officers themselves maliciously and wantonly violated prison protocol in regards to Plaintiff initially advising officers of his suicidal ideation, possessing a piece of metal that Plaintiff made his initial suicidal threats with, ignoring the self-harm Plaintiff had inflicted after advising officers of his suicidal state repeatedly, and ultimately placing Plaintiff on control status instead of clinical observation status. Such matters evidence that Defendants were not at all concerned about Plaintiff injuring himself, but in fact were more

2

interested in wantonly and sadistically causing him harm. As such,
the Defendants were corruptly calculating the circumstances to
abuse their authority for private ends at any given opportunity
that they could explain away. However, Plaintiff complied with all
verbal directives from the time the extraction team approached
his cell (unless they were clear abuses of authority, like telling Plan-
tiff to be quiet) to finally being placed back in his cell on
control status. Plaintiff did not threaten any officer prior to
Bortz's unnecessary and unjustified use-of-force. The caselaw
is clear, plaintiff had a constitutionally protected right to
be free from the unnecessary and wanton infliction of pain.

   Notably, Bortz's unnecessary and unjustified use-of-force
was not the professed minimal amount of force necessary to
gain Plaintiff's verbally undirected compliance under such circ-
umstances, an in fact is the disguised conduct the Constitu-
tion prohibits due to several undeniable factors that evidence
Bortz's malicious and sadistic intent to apply force not in
good-faith..., 1.) Bortz didn't attempt to give a verbal directive
prior to his unnecessary and unjustified use-of-force, so Plaint-
iff had no orders to comply with and therefore, was not a
compliance hold, 2.) Bortz was not under circumstances that
required a split-second decision, nor was institution security
at stake as articulated in Whitley (See Hudson v. McMillian,
503 U.S. 1, 12-13 (1992)(opinion of Stevens, J.), 3.) Bortz can be
seen in the video evidence lurking on Plaintiff just before

he initiates force without giving the required verbal directive under such circumstances to temper a forceful response, which further evidences Bortz's malicious and sadistic intent, 4.) Plaintiff was fully subdued and secured in multiple forms of restraints, an therefore not a threat by any stretch of the imagination, 5.) Bortz placed Plaintiff in a "pressure point" hold, which is intended to cause significant amounts of pain, not the professed "standard compliance" hold or "head control" hold per Doc compliance hold training, thereby even further evidencing Bortz's malicious and sadistic intent to inflict unnecessary and wanton pain, and lastly 6.) Bortz's dramatic effect pronouncement stating: "You need to stop messing with the restraints" was a calculated cover-up act.

Additionally, no reasonable and professionally trained prison official would perceive an inmate so restrained as Plaintiff was as a legitimate threat of any kind, unless exaggerated (as a cover-up act) to inflict unnecessary and wanton pain. DAI (Division of Adult Institutions) policies concerning the use-of-force in addition to security officer's training is accordance with those policies are designed to conform to constitutional standards, not allow prison official's to exaggerate the need for and/or maliciously and sadisticly abuse their authority in the application of force to create justifiable means outta means outta nothing. The same goes for policies on incident report (IR) submissions after incidents of use-of-force, those policies are designed to prevent corruption and preserve genuineness at the time of occurrance. Bortz's use-of-force was outside protocol, as well as shows

4

prison officials' above-the-law mentality by consciously trampling on the Constitution and in the aftermath, making exaggerated claims as to the preceived threat Plaintiff possed and the need for force (basic prison cover-up tactics) under such circumstances in concert with his superior colleague Olson. A reasonable jury could find for Plaintiff on his Eighth Amendment claims. As such, the Defendants are not entitled to summary judgement on either Constit-utional claim.

Qualified immunity is also irrelevant because the right to be free from the unnecessary and wanton infliction of pain in the excessive force context, has been clearly estab-lished under fact intensive matters. It has also been clear that, prison officials aren't entitled to violate the Constitution by making exaggerated claims in good faith to justify the force used as Constitutionally permissible. Logically speaking, just how much more dose one need to be restrained, in order to be preceived as "not a threat?"

Lastly, per policy and institution standard practice Defendants were required to offer medical attention after any incident of use-of-force, but blatantly disregarded that obligation. Plaintiff did in fact seek medical attention the day of incident—via verbal request, and acouple days after—via submitting a HSR (Health Services Request) slip(s) up until the

day he was released from CCI approximately.

## STATEMENT OF FACTS

This section contains a summary of the pertinent additional facts that Defendants' left out. A full recitation of the additional facts is contained in the Plaintiff's Proposed Findings of Additional fact ("PPFAF").

Plaintiff Troy Hammer was housed at Columbia Correctional Institution (CCI) from October 29th, 2018, until June 16th, 2020. (PPFAF ¶ 1.) On November 6th, 2018, at sometime approximately around 3:00 p.m. - 5:00 p.m., Plaintiff advised officers Barry and Keske several different times that he was feeling suicidal and needed to be placed on clinical observation. Plaintiff at one point, showed officers Barry and Keske a piece of metal, informing them that he intended to use it to act on his suicidal and self-harmful ideation. Officers Barry and Keske wantonly ignored Plaintiff's threats of suicidal and self-harmful intent without any professional responsive action in accordance with their training and policies and procedures. (PPFAF ¶¶ 3-5; see also Defendants' Ex. 1002 at 07:51-08:62 (made continued threats and confirmed that he did show the piece of metal to officers), 08:27-08:48 (Lt. Olson and officer Keske talk discreetly about the piece of metal and officer Keske confirms that, as well as the size of the metal piece))

Around approximately 6:30 p.m. - 7:30 p.m., Plaintiff acted on his

6

threats of suicidal and self-harmful intent by lacerating his left forearm with the piece of metal he showed to officers earlier. Shortly after Plaintiff lacerated his left forearm, Lt. Olson and officer Conroy came down the B-lower tier of RHU 2, escorting another inmate back to his cell (#40). At which time, Plaintiff started yelling at the top of his lungs to Lt. Olson that he was suicidal, had advised officers Barry and Keske earlier, which they ignored and had already engaged in self harm. Lt. Olson and officer Conroy walked back towards the tier exit and Plaintiff knocked on his cell door window to get officer Conroy's attention. When officer Conroy looks, Plaintiff showed him the piece of metal and the wound already inflicted, as well as advises him that he was suicidal. However, Lt. Olson and officer Conroy wantonly ignored Plaintiff's suicidal and self-harmful state, as well as their response training in accordance with policies and procedures upon witnessing and/or being informed of such matters. (PPFAF ¶¶ 6-10.)

Sometime later, officers Barry and Keske started doing night time (HS) medication pass on B-lower tier of RHU 2. Once officers Barry and Keske approached Plaintiff's cell (#41) and opened the trap, Plaintiff again advised the officers that he was suicidal, needed to be placed on clinical observation, showed them the piece of metal, and the self-harm already inflicted. Officers Barry and Keske again, wantonly ignored Plaintiff's safety, prison protocol concerning such circumstances, and

7

continuously asked Plaintiff to allow them to close the trap so they could continue with medication pass. Plaintiff refused to let the officers secure the trap in an attempt to get help and placed on clinical observation due to his suicidal and self-harmful state, as well as to ensure his own safety and to talk to someone from psychological services. In response to such, officers Barny and Keske then discontinued medication pass, exited the tier and notified Sgt. Raisanen that Plaintiff was holding the trap hostage. (PPFAF ¶¶ 11-15.)

Shortly later, Sgt. Raisanen responded to Plaintiff's cell (#41), at which time Plaintiff informed him that he was suicidal, showed him the piece of metal, stuck his arm out the trap and engaged in self-harm right in front of him. Sgt. Raisanen wantonly disregarded Plaintiff safety, his own response training and prison protocols upon witnessing such an incident by exiting the tier. (PPFAF ¶¶ 16-17.)

Eventually, Lt. Olson approached Plaintiff's cell (#41), at which time Plaintiff again notified him that he was suicidal, needed to be placed on clinical observation, and showed him the self-harm Plaintiff had already inflicted. Despite Plaintiff's suicidal and self-harmful state, Lt. Olson asked Plaintiff to pull his arm inside the trap so that medication pass could resume. Plaintiff refused and again advised him that he needed to be placed on clinical observation. Plaintiff asked Lt. Olson why was everyone disregarding his safety or giving him silent to

silent encouragement to kill himself? Lt. Olson responded, "no one is ignoring your safety and we can put you on control status." Plaintiff reacted by saying, "lets go then." Lt. Olson then exited the tier. (PPFAF ¶¶ 18-19.)

Sometime later, Lt. Olson and the extraction team entered the tier and approached Plaintiff's cell (#41). Plaintiff had already placed his hands out or near the trap to be restrained and was in complete compliance from then on out. The officers attached a tether to the door and placed the wrist restraints/ cuffs on, had Plaintiff's cell door opened and Plaintiff kneeled down. Officers then applied leg restraints, stood Plaintiff up and escorted him to the shower area where officers preformed a staff assisted strip search. Plaintiff's left forearm wound was treated by RN Gibbons, which Plaintiff inflicted using the piece of metal he showed officers earlier, when he continuously pled for help and a observation placement. (PPFAF ¶¶ 21-23.)

Notably, Plaintiff did not make any kind of threats towards any officer, other then self-harmful threats. Plaintiff was also compliant, non-threatening or recalcitrant the entire time prior to officer Bortz's unnecessary and unjustified use-of-force. (PPFAF ¶ 20.)

Plaintiff was eventually escorted to the dayroom and placed in the restraint chair. Once Plaintiff was fully subdued and secured in the restraint chair with multiple different forms

9

of restraints on, Plaintiff eventually tried to readjust himself
afew times due to his hands going numb and/or witnessing dis-
comfort from his body weight adding pressure to his cuffed
wrists and hands.(PPFAF ¶¶ 24-25.)

However, the shoulder strap fell slightly off to the side of
Plaintiff's right shoulder — Defendants are blatantly exaggerating
any matters referring to such a fact and/or the need for force
based on such a fact — despite Plaintiff still being "securely
restrained" in the chair. Defendants then continue to exagger-
ate implausible (waived) reasons to corruptly justify their
collusive act in the unnecessary and unjustified use-of-force,
by simply alleging (after-the-fact speculation) that Plaintiff could
have flipped the chair, started selfharming and/or referring
to the piece of metal.(PPFAF ¶¶ 26-28, 32-33, 39.)

Slightly prior to Officer Bortz's use-of-force, he can be seen
lurking to use force and gives no verbal directives to temper a
forceful response. When officer Bortz initiates his use-of-force,
he dose so with such unnecessary force that he nearly loses
his own footing as he maliciously and sadisticly places Plain-
tiff in a "pressure point" hold that is intended to cause pain by
itself, not the simply professed "standard compliance" hold. Meanw-
hile, Lt. Olson is in the rearview..., observing and condoning the
entire incident, which he allows to last for an approximate
minute without interferring. And the whole time Plaintiff is
in significant amounts of pain. Once Lt. Olson finds the harm

satisfactory enough—absent any plausible threat prior to and/or during the use-of-force— he finally orders officer Bortz to let go and briefly continues to patronize Plaintiff, despite the unnecessary and wanton pain Plaintiff had already suffered, as well as the mental and emotional affect of such unjustified force caused. (PPFAF ¶¶ 29-32, 34, 38.)

Plaintiff was left in the restraint chair and eventually escorted back to his cell (#41) and placed on control status, instead of clinical observation status as a result to Lt. Olson's falsely reporting inaccurate information to on-call Dr. Stange. (PPFAF ¶¶ 40-41.)

Prior to officers removing Plaintiff from the restraint chair, he did request to see HSU and submitted a HSR slip a couple days later complaining of back and neck pain. Plaintiff continues to submit HSR slips complaining of back and neck pain up until his approximate release from CCI. Plaintiff's medical attention for such medical complaints were very limited and/or non-existent. Officer Bortz's use-of-force exacerbated Plaintiff's back and neck pain/problems. (PPFAF ¶¶ 35-37.)

## SUMMARY JUDGEMENT STANDARD

On summary judgement the Court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a fact finder Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003). In determining whether a genuine

issue of material fact exists, the Court must construe all facts in the light most favorable to the nonmoving party (Plaintiff), as well as to draw all reasonable and justifiable inferences in favor of that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). When evidence is presented that shows a dispute over facts that might affect the outcome of the suit under governing law, summary judgement must be denied. Id. at 248.

## ARGUMENT

I. THE EIGHTH AMENDMENT EXCESSIVE FORCE CLAIM IS AN OBVIOUS VIOLATION AS A MATTER OF LAW.

A. Overview of the Law.

In the excessive force context, "the unnecessary and wanton infliction of pain... constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Hudson v. McMillian, 503 U.S. 1, 5 (1992)(citing Whitley v. Albers, 475 U.S. 312, 319 (1986). The core requirement for such a claim is whether force was not applied "in a good-faith effort to maintain or restore discipline, but "maliciously and sadisticly to cause harm." Hendrickson v. Cooper, 589 F.3d 887, 890 (7th Cir. 2009)(quoting Hudson v. McMillian, 503 U.S. 1, 7 (1992). That ultimate determination,

thus, requires a fact-intensive inquiry of whether an officer's use of force was legitimate or malicious, such factors include: (1) the need for an application of force, (2) the relationship between that need and the force applied, (3) the threat reasonably perceived by the responsible officers, (4) the efforts made to temper the severity of the force employed, and (5) the extent of the injury suffered by the prisoner." Hendrickson v. Cooper, 589 F.3d at 890 (quoting Out-law v. NewKirk, 259 F.3d 833, 837 (7th cir. 2001)). From such considerations inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." Whitley v. Albers, 475 U.S. 312, 32) (1986).

The Seventh Circuit Court of Appeals has elaborated on the term "excessive force" and confirming the retirement of the formula "de minimis uses of physical force" with articulating the following:

> [F]orce in the language of physics is mass (which equals weight as long as you're not in outer space) times accelera-tion. But when cases talk about "excessive force" they usua-lly mean rough or otherwise improper handling that causes excessive pain or other harm. If a guard restrains a priso-ner by poking the prisoner's cheek with the lighted end of a cigarette, the modest force exerted causes a more pai-nful injury than if the guard had dragged the prisoner

into a cell, even though he'd have had to exert much
greater force to accomplish that. If in dragging the
prisoner he uses more force than is necessary and
by doing so produces gratuitous pain or injury, [Sev-
enth Circuit] say that the force was excessive. But
force is not the issue in the cigarette example....

Washington v. Hively, 695 F.3d 641, 642-43 at HN 122 (7th Cir. 2012).
Thus, as the Supreme Court has said, pain, not injury, is the
barometer by which [Courts] measure claims of excessive
force. Lewis v. Downey, 581 F.3d 467, 475 (7th Cir. 2009)(citing
Hudson, 503 U.S. at 9).

When situations present a clear lack of the circumstances arti-
culated in Whitley, where institutional security is not at stake,
[an] officer's license to use force is more limited; to succeed, a
plaintiff need not prove malicious and sadistic intent. See Hu-
dson, 503 U.S. at 12-13 (opinion of Stevens, J.). "This approa-
ch is consistent with the Court's admonition in Whitley
that the standard to be used is one that gives 'due regard'
for differences in the kind of conduct against which an
Eighth Amendment objection is lodged.'" Id. quoting Whitley,
475 U.S. at 320.

Furthermore, the Seventh Circuit has explicitly cautioned
that such force could not be "exaggerated or excessive"
and should generally follow "adequate warning [5]." Lewis v.

Downey, 581 F.3d 467, 479 (7th Cir. 2009)(quoting Soto v. Dickey, 744 F.2d 1260, 1270-71 (7th Cir. 1984)). Notably, the infliction of pain that is "totally without penological justification" is per se malicious. Fillmore v. Page, 358 F.3d 496, 504 (7th Cir. 2004).

B. Bortz's use of force was in fact a "pressure point" hold, that is intended to cause significant amounts of pain—not the simply professed "compliance hold"—despite no orders given to comply with..., thereby evidencing that force was not applied in an attempt to gain Plaintiff's undirected compliance or in a honest interest of both Plaintiff's and officers' safety.

The force utilized by Bortz was blatantly unnecessary and unjustified when viewed upon considerations of all factors to make the ultimate determination as to good-faith. See Whitley, 475 U.S. at 321.

1. Officers repeatedly and wantonly ignored Plaintiff's pleas for help with a clinical observation placement after he had advised officers numerous times of his suicidal and self-harmful ideation, as a result Plaintiff held his trap in another attempt to get help and in contact with a supervisor in hopes that they would ensure due care by contacting the on-call PSU clinician and placing Plain-

tiff on clinical observation. Once fully subdued
and secured in the restraint chair, Plaintiff
attempted to adjust himself and was malic-
iously and sadisticly attacked without
justification.

Defendants and/or assisting officers own actions on November
6th, 2018, prior to Bortz's use-of-force were substantial breaches
of inmate treatment and their training in accordance with the
established policies and procedures of the WI DoC, as well as
evidence deliberate corruption in institution practices, the treat-
ment of Plaintiff and wanton disregard for his safety and/or
providing access to adequate medical/psychological care or
interfering with such access by falsely reporting inaccurate
information to the on-call (PSU) staff Dr. Stange. Plaintiff
repeatedly advised officers that he was suicidal and/or
self-harmful, needed to be placed on clinical observation, show-
ed officers a piece of metal that he intended to use to act on
his suicidal ideation, and ultimately engaged in self harm as
a result to officers condescendingly and wantonly disregarded
Plaintiff's safety. (PPFAF ¶¶ 3-10, 20, 42) The only way Plain-
tiff knew how to get the attention of supervisory staff or
force officer's to take action concerning his suicidal and self-
harmful state was to hold his trap in another attempt to plead
for help, as well as to get officers to actively record as they were

16

not activating their body cams as required by policy under such circumstances, Plaintiff never made any sort of threat to officers, other then himself and was compliant an non-recalcitrant throughout the entire incident. (PPFAF ¶¶ 11-21, 42.)

Notably, officers did in fact confiscate the piece of metal shown to them. Officers even conducted a staff assisted strip search on Plaintiff after removing him from his cell, which yielded no contraband and futher evidences that officers were aware of the fact or had no suspicions to believe that Plaintiff was concealing any contraband. (PPFAF ¶¶ 20-22, 28, 33.) Despite the fact that officers ignored Plaintiff revealing the piece of metal to them and his threats to self-harm with it, makes it clear that they didn't preceive him as a threat based on such invalid after-the-fact assertions, and are simply making them now because it conviences them in their corruption. If Officers did honestly preceive Plaintiff as a threat with the piece of metal, they would have immediately acted at the time and in accordance with training, policies and procedures as well as prison protocols. Officers defiantly ignored their professional obligations concerning such matters and were the creators of their exaggerated danger and fraudulently orchestrated delimma. There are reasons why regulations are developed in the administrations of prisons and concerning the conduct of officers on their duties, which is simply to protect officers and inmates, as well as to ensure due care and prevent corruption. See e.g.

17

Vitarelli v. Seaton, 359 U.S. 535, 540, 79 S. Ct. 968, 3 L.Ed. 2d 1012 (1959) (stating that governmental entities must be "bound by the regulations which [they themselves] ha[ve] promulgated"). Unless, that is if "we are to view our prisons as Hobbesian Islands ruled by cold, lawless power." Leslie v. Doyle, 125 F.3d 1132, 1137 (7th Cir. 1997). Although, this is not dispositive it is just note worthy for the fact that, if officers responded accord- ingly with their training and policies and procedures at the first instance Plaintiff notified officers of his suicidal and self-harmful intent, the matter would have been properly resolved. But only evidences that a group of officers had nothing else in mind, but to mistreat Plaintiff.

Once Plaintiff was fully subdued and secured in the restraint chair with multiple different forms of restraints, thus, eliminating any potential threat — as is intended for such purposes — he attempted to readjust himself as a result to his hands going numb and/or witnessing discomfort. (PPFAF ¶¶ 24-25.) As Plaintiff was readjusting himself (his right shoulder strap slips off slightly to the side of his right shoulder, but undeniably still "securely restraining" Plaintiff to the chair), Bortz attacks Plaintiff without the simplest verbal directive to temper a forceful reponse, despite a clear lack of any perceivable threat or the need for force under such circumstances, other then complete and utter exaggeration. Plaintiff did not make any kind of threats towards officers, other then self-harm and

was compliant when orders were given, but not when they were obvious abuses of authority, such as, telling Plaintiff to be quiet. Plaintiff was not acting in a threatening manner or being recalcitrant (PPFAF ¶¶ 26, 26, 29-31, 34, 43.) However, any reasonably trained veteran officer is cognizant of the very purpose of restraints and their effectiveness in eliminating any safety concerns. Furthermore, Bortz was required by policies and procedures to submit a incident report (IR) after his use of force, as well as instructed by Lt. Olson to submit a incident report, but either did or didn't or the WI DOC is aiding in mass corruption and deleted Bortz's IR. (PPFAF ¶ 39)

Again, Bortz violated policies and procedures in the application of force, as well as his own training in accordance with those policies when he made no attempt to temper a forceful response by verbal orders under circumstances lacking a emergency. Then disregards Lt. Olson's instructions to submit his IR, despite policies that make it mandatory requirement to submit IR after use of force. There are reasons why regulations are developed in the administrations of prisons and concerning the conduct of officers on their duties, which is simply to protect officers and inmates, as well as to ensure genuineness in the actions taken and prevent corruption. See e.g. Vitarelli v. Seaton, 359 U.S. 535, 540 (1959)(stating that governmental entities must be bound by the regulations which [they themselves] ha[ve] promulgated"). Unless,

that is if "we are to view our prisons as Hobbesian Islands ruled by cold, lawless power." Leslie v. Doyle, 125 F.3d 1132, 1137 (7th Cir. 1997).

Plaintiff did request to see HSU as officers removed him from the restraint chair and submitted a HSR slip a couple days later complaining of back and neck pain. Furthermore, throughout the unnecessary and wanton use of force by Bortz, Plaintiff was in significant amounts of pain, which is what "pressure point" holds are intended to cause and Plaintiff was unable to breathe or talk for approximately the first 20-25 seconds of the minute long agony maliciously and sadisticly inflicted by Bortz, without any justification other then his own private ends. (PPFAF ¶¶ 35-37.)

2. Bortz's use of force was not a good-faith attempt to gain compliance — despite no verbal directives given for Plaintiff to comply with and such an assertion is implausible. Bortz's use of force evidences malicious and sadistic abuse of authority.

"[T]he core judicial inquiry" is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadisticly to cause harm." Outlaw v. Newkirk, 259 F.3d 833, 837 (7th Cir. 2001)(quoting Hudson, 503 U.S. at 7, 112 S.Ct. 995 (citation omitted)). However, the Courts admonition in Whitley that the standard to be used is

one that gives due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged." See Hudson, 503 U.S. at 12-13 (opinion of Stevens, J.)(quoting Whitley, 475 U.S. at 320).

In conducting the core judicial inquiry, the five factors articulater in Outlaw are responsive here. The first factor, is whether force was needed. Plaintiff was compliant, did not make any threats towards officer's safety, other then his own, was not acting in a threatening manner or being recalcitrant prior to Bortz's use of force. The piece of metal had been confiscated and officers preformed a thorough staff assisted strip search. Furthermore, Plaintiff was fully subdued and secured in multiple different forms of restraints. See Hope v. Pelzer, 536 U.S. 730, 738 (2002)(Any safety concerns had long since abated by the time petitioner was handcuffed to the hitching post because Hope had already been subdued, handcuffed, placed in leg irons); See also Hudson, 503 U.S. at 13 (opinion of Stevens, J.)(because there was no prison disturbance and no need to use any force since plaintiff was already in restraints); Hendrickson v. Cooper, 589 F.3d 887, 891 (7th Cir. 2009)(holding that an inmate's constitutional rights are violated where prison guards use physical force when the inmate poses no threat). Officers based on their training in restraints are well aware of the purpose of restraints and the effectiveness of

eliminating any preceivable threat. So force was absolutely not warranted in this case and should have never been the first option. See Whitley, 475 U.S. at 320 (decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance). This case lacked such circumstances. The Seventh Circuit cautioned that such force could not be "exaggerated or excessive". Lewis v. Downey, 581 F.3d 467, 479 (7th Cir. 2009)(citing Soto v. Dickey, 744 F.2d 1260, 1270-71 (7th Cir. 1984)).

The second factor is the relationship between the need for force and the force applied. Well, as noted in the first factor, Plaintiff had been fully subdued and secured in the restraint chair with multiple different forms of restraints on, thereby, eliminating any preceivable threat or safety concerns as they are designed to do. Notably, no orders were given to comply with, so gaining Plaintiff's compliance is implausible. However, the force applied was a "pressure point" hold, which is solely intended to cause significant amounts of pain by itself. The only relationship that existed between the need for force and the force applied was Bortz's "misuse of official authority for private ends." Anderson v. Romero, 72 F.3d 518, 521 (7th Cir. 1995).

The third factor is the threat reasonably perceived by officers. So again, we go back to what's been noted in the first factor. Plaintiff was fully subdued and secured in the restraint

22

chain with multiple different forms of restraints on. No threats
were made directly to officer's safety, the piece of metal had
been confiscated, and Plaintiff simply adjusted himself. Bortz
abused his authority, as well as violated his training in acc-
ordance with policies and procedures in the application of
force and to further that species of intent, Bortz disregarded
submitting his incident report (IR) as required by those
policies and procedures after any incident of use of force, and
detailing the reasons and/or threats preceived that resulted
in the officers actions, all for the sake of genuineness
and since Bortz didn't submit his IR his after-the-
fact assertions are waived. No reasonable officer would
have preceived Plaintiff as a threat, based on the fact
of Plaintiff's physically subdued state and their knowledge
in the purpose of restraints and the effectiveness of abating
threats to officer's and inmate safety. This would be a
prime example of the Seventh Circuit cautioning against
"exaggerat[ion] and excessive". Lewis v. Downey, 581 f.3d
467, 479 (7th Cir. 2009) (citing Soto v. Dickey, 744 f.2d
1260, 1270-71 (7th Cir. 1984)). Bortz is not entitled to
"pile conjecture upon conjecture" (Reed v. Faulkner, 842 f.2d
960, 963-64 (7th Cir. 1988)); cf. Miller-El v. Crockell, 537
U.S. 322, 340 (2003) ("deference does not imply abandonment
or abdication of judicial review") to justify his use
of force in violation of his own training an in accordance

with policies and procedures and prison protocol in the application
of justifiable force, despite the clear lack of an emergency
situation." Hope v. Pelzer, 536 U.S. 730, 738 (2002); cf. Whitley,
475 U.S. at 320. It would be absurd and a significant miscarriage
of justice to allow officers to abuse their authority by simply
pronouncing any threat preceived that is blatantly belied
by the circumstances.

   The fourth factor is the efforts made to temper the severity
of the force employed. No efforts were made to temper a forceful
response. Despite the fact that Plaintiff was fully subdued and
secured in the restraint chair and posed no threat, Bortz's
did not even give the simplest "warning" or verbal directive prior
to his unjustified use of force. Lewis v. Downey, 581 F.3d 457,
479 (7th Cir. 2009)(quoting Soto v. Dickey, 744 F.2d 1260, 1270-71
(7th Cir. 1984)). Notably, "justification does not necessarily exist
[in] every [instance] or when] an inmate is slow to comply with
an order." Lewis, 581 F.3d at 477 (citing Treats v. Morgan,
308 F.3d 868, 873 (8th Cir. 2002)("Not every instance of inmate
resistance justifies the use of force....").Not to forget the
fact that Plaintiff was compliant and not acting in a threatening
manner the entire time prior to Bortz's unjustified use of
force. However, Bortz's employed a "pressure point" hold without
constraint, which is intented to cause significant amounts of
pain, not the professed "compliance hold" as the WI DOC
standard compliance hold articulated in Boyd v. Pollard, 621 Fed.

App'x 352, 354 (7th Cir. 2015)(while Beahm maintained a compliance hold with his right hand under Boyd's chin and left hand securing the top of Boyd's head to his chest).

The final factor is the extent of the prisoner's injury. It is obvious that Plaintiff was experiencing significant amounts of pain, just based on the fact that Bortz had Plaintiff's in a "pressure point" hold for approximately one minute. "[O]ne need not have personally endured a [pressure point hold] to know the pain that must accompany it." Lewis, 581 F.3d at 475. Furthermore, Plaintiff is not required to provide objective medical evidence given the uniquely subjective nature of his pain and suffering. See Hendrickson, 589 F.3d at 893 HN 12. (PPFAF ¶¶ 35-37.)

As such, Bortz's use of force was not applied in a good-faith effort to maintain or restore discipline, but evidences malicious and sadistic intent to cause harm based on every factual inquiry previously addressed and articulated in Outlaw [359 F.3d at 837]. Bortz had absolutely no penological justification for such force and to further his abuse-of-authority, he disregards mandatory obligations concerning the proper documentation of such matters, which inturn only evidences a species of intent, that he knew he was wrong and that such actions were in violation of his training and policies and procedures in the application of force.(PPFAF ¶¶ 31,39). See also Vitarelli v. Seaton, 359 U.S. 535, 540 (1959)

(Stating that governmental entities must be "bound by the regulations which [they themselves] ha[ve] promulgated"). Unless, that is if "we are to view our prisons as Hobbesian Islands ruled by cold, lawless power." Leslie v. Doyle, 125 F. 3d 1132, 1137 (7th Cir. 1997).

II. OLSON IS NOT ENTITLED TO SUMMARY JUDGEMENT BECAUSE BORTZ DID USE EXCESSIVE FORCE AND OLSON FAILED TO INTERVENE.

A. In a Eighth Amendment failure to intervene claim there must be an underlying violation of Plaintiffs constitutional rights committed by Bortz.

An official "can be held liable if Plaintiff can show that [Olson] (1) had reason to know that [Bortz] was using excessive force or committing a constitutional violation, and (2) had a realistic oppurtunity to intervene to prevent the act from occurring." Lewis v. Downey, 581 F. 3d 467, 472 at HN1 (7th Cir. 2009).

Notably, not only is the Eighth Amendment excessive force violation obvious, but Olson was even more cognizant of the violation based on his training in accordance with WI DOC use of force policies and procedures, when he observed Bortz initiate his use of force in direct violation of their train-

ing practices in accordance with those policies and procedures, which are designed to comply with constitutional standards. See e.g. Whitman v. Nesic, 368 F.3d 931, 934-35 (7th Cir. 2004)(upholding prison's policy of requiring inmates to be naked while providing urine sample as justified by prison's concern that inmates could contaminate or substitute their urine sample).

III. DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY BECUASE PLAINTIFF'S RIGHT TO BE FREE FORM EXCESSIVE FORCE IS A CLEARLY ESTABLISHED RIGHT AS THE LAW EXISTS.

Qualified immunity protects government officials from liability for civil damages if their actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). For a constitutional right to be clearly established, it's contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an officials action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." Hope v. Pelzer, 536 U.S. 730, 739 at HN[7][8](2002). The apparentness

of the unlawfulness is established by "fair warning" that[Defendants'] conduct deprived [Plaintiff] of a constitutional right, and that the standard for determining the adequacy of that warning was the same as the standard for determining whether a constitutional right was clearly established." Id. at 740.

However, "[t]he notion that unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment is not a new or unusual constitutional principle." Hill v. Shelander, 992 F.2d 714, 718 (7th Cir. 1993)(internal quotations and citations omitted).

In the excessive force context, liability is a fact-intensive judicial inquiry that consists of the following factors:

> "[T]he need for an application of force, the relationship between that need and the force applied, the threat reasonably perceived by the responsible officers, the efforts made to temper the severity of the force employed, and the extent of the injury suffered by the prisoner."

Hendrickson v. Cooper, 589 F.3d 887, 890 (7th Cir. 2009) (quoting Outlaw v. Newkirk, 259 F.3d 833, 837 (7th Cir. 2001); see also Whitley v. Albers, 475 U.S. 312, 321 (1986). When institutional security is at issue as articulated in Whitley, "the [core requirement] whether the measure taken inflicted unnecessary

and wanton pain and suffering ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadisticly for the very purpose of causing harm'." Whitley, 475 U.S. at 320-321. The instructiveness from the foregoing factors are relevant to that ultimate determination. "From such considerations inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." Id. at 321.

However, "[a]bsent [the] special circumstances [articulated in Whitley] the less demanding standard of "unnecessary and wanton infliction of pain" should be applied". See Hudson v. McMillian, 503 U.S. 1, 12 (1992)(opinion of Stevens, J.). "This approach is consistent with the Court's admonition in Whitley that the standard to be used is one that gives 'due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged'." Id. at 13 (quoting Whitley, 475 U.S. at 320).

Recognizably so, because the defendant's intent weighs so heavily in the excessive force standard, if a jury concludes that a plaintiff has met that standard, a prison official cannot then claim that he reasonably believed his actions were lawful. Hill, 992 F.2d at 718; see also

Turner v. Rataczak, 28 F. Supp. 3d 818, 822 at HN6 (W.D. Wis. 2014).
It is "clear that officials can still be on notice that their
conduct violates established law even in novel factual circu-
mstances." Hope, 536 U.S. at 741. The infliction of pain that
is "totally without penological justification" is per se ma-
licious. Fillmore v. Page, 358 F. 3d 496, 504 (7th Cir. 2004)(cit-
ing Hope, 536 U.S. at 737 (2002)(quoting Rhodes v. Chapman,
452 U.S. 337, 346 (1981)); see also Hendrickson v. Cooper,
589 F. 3d at 891 (7th Cir. 2009)(holding that an inmate's
constitutional rights are violated where prison guards use
physical force when the inmate poses no threat).

   Notably, the Seventh Circuit has cautioned that such
force could not be "exaggerated or excessive" and should
generally follow "adequate warning[s]". Lewis v. Downey,
581 F. 3d 467, 479 (7th Cir. 2009)(quoting Soto v. Dickey, 744
F.2d 1260, 1270-71 (7th Cir. 1984)). After all, misuse of
official authority for private ends is how a deprivation
of life, liberty, or property without due process of law
is found. Anderson v. Romero, 72 F. 3d 518, 521 (7th Cir.
1995).

CONCLUSION
   For the foregoing reasons, Plaintiff respectfully request that
this Court DENY Defendants' Motion for Summary Judgement
in its entirety and bound this case over for trial.

Dated this 9th day of November 2022.

Respectfully Submitted,
S/Troy Hammer
Troy G. Hammer
Pro se Plaintiff

Troy G. Hammer #489983
Dodge Correctional Institution
P.O. Box 700
Waupun, WI 53963

31