IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

TROY HAMMER,

                Plaintiff,                      OPINION AND ORDER

v.

                                          20-cv-202-wmc

CHRISTOPHER BORTZ and
CHRISTOPHER OLSON,

                Defendants.

*Pro se* plaintiff Troy Hammer is proceeding against Columbia Correctional Institution ("Columbia") Officers Christopher Bortz and Christopher Olson on claims that they violated his rights under the Eighth Amendment of the United States Constitution. In particular, Hammer contends that on November 6, 2018, Correctional Officer Bortz used excessive force against him while placing Hammer in a restraint chair, and that Lieutenant Olson failed to intervene to prevent or stop Bortz's inappropriate use of force. Now before the court is defendants' motion for summary judgment. (Dkt. #37.)

Unfortunately for plaintiff, the undisputed evidence of record, including a video and audio recording of the material events, shows that before he was restrained, Hammer was disobedient and posed a risk to himself, and even after being restrained, a strap fell off his shoulder, justifying Bortz placing Hammer in a compliance hold while other officers reset the restraints. As a result, no reasonable factfinder could conclude that Officer Bortz used force against Hammer in an effort to harm him, rather than to restore order; and thus, neither could a reasonable factfinder conclude that Olson's failure to intervene to stop Bortz from restraining Hammer constituted a constitutional violation. Accordingly, the

court will grant defendants' motion for summary judgment and direct the clerk of court to enter judgment in defendants' favor.

UNDISPUTED FACTS[1]

Plaintiff Troy Hammer was incarcerated at Columbia from October 29, 2018, through June 16, 2020. During the relevant time period, defendant Christopher Olson was working there as a Lieutenant, and defendant Christopher Bortz was working as a Correctional Officer.

On November 6, 2018, Hammer was being held in Columbia's restrictive housing unit ("RHU"). That evening he committed self-harm by lacerating his left forearm with a piece of metal. Hammer also started yelling that he was feeling suicidal. Nevertheless, according to Hammer, Officers Olson and other officers did not stop to talk to him.

Later that evening, Hammer told officers passing out medications that he was feeling suicidal. Hammer claims that because the officers ignored his pleas for help, he refused to close his cell trap door in an effort to ensure his own safety. Because Hammer was holding up the medication pass, Olson was then called to the RHU and stood in front of Hammer's cell to speak with him. After Hammer reported that he had harmed himself, Officer Olson observed what appeared to be dry blood on Hammer's left forearm, and he asked Hammer

---

[1] Unless otherwise indicated, the following facts are material and undisputed. The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying evidence of record as appropriate. Hammer has included numerous proposed findings of fact unrelated to his excessive force and failure to intervene claims; in particular, facts related to his complaints about self-harm that occurred before the cell extraction. Hammer has not explained how these facts relate to his claims in this lawsuit, so the court has excluded them, except as necessary to provide context for the material events.

to pull his arm inside his cell so that the medication pass could resume. Hammer refused, stating in part that he needed to get rid of some property. Hammer also stated that he wanted to be placed in control status because he still felt like self-harming.

At that point, Olson instructed Hammer to turn around and place his hands out of the trap door to be restrained. According to Olson, Hammer refused and instead told Olson that officers would have to suit up and gas him to gain his compliance. (Olson Decl. (dkt. #40) ¶ 10.) Hammer disputes that Olson asked him to submit to restraints, and he further maintains that Olson ignored his threats of self-harm. Olson says that he next told Hammer that he could comply with directives and avoid having a team assembled, but he again insisted that the officers would have to suit up. Olson then went to the supervisor's office and spoke with multiple superiors about Hammer's behavior. After Olson received approval for a planned use of force, he obtained Mark 9 Oleoresin Capsicum ("OC") spray and returned to the RHU to speak with Hammer again.

Because Hammer still would not comply with directives, Olson then went to the day room and assembled an extraction team, consisting of himself, co-defendant Bortz and non-defendants Ryan Winwood, Cory Keske and Kevin Hines, with Officer Chloe Ware videotaping the extraction. After Olson briefed the team, they approached Hammer's cell. At his cell front, Olson directed Hammer to turn around and place his hands out of the cell to be restrained. At that point, Hammer stated that he would comply and placed his hands out for the officers. The officers then restrained Hammer without incident and escorted Hammer to the shower area. There, officers conducted a staff assisted strip search, and Hammer received a towel for privacy. A short while later a nurse arrived on the unit

3

to assess Hammer's left forearm. She observed a superficial cut, apparently the result of Hammer cutting himself with a metal object earlier that day.

Throughout the strip search Hammer continued to threaten self-harm. Therefore, staff escorted him to the day room to be placed in a restraint chair. In the restraint chair, Hammer's shoulders were pinned with a strap about the width of a seatbelt. According to Olson and Bortz, however, Hammer started to manipulate the restraints by rolling his right shoulder. (Olson Decl. (dkt. #40) ¶ 18; Bortz Decl. (dkt. #41) ¶ 12.) Hammer disputes trying to manipulate the restraints, stating that he was instead moving to readjust himself because his hands had gone numb, and he was uncomfortable. (Hammer Decl. (dkt. #65) ¶¶ 26-35.) The video footage defendants cite does not clearly show Hammer rolling his shoulders or moving in a way suggesting that he was trying to move around the shoulder straps. (*See* Ex. 1002 at 9:36-12:30; Ex. 1004 at 8:19-11:11.) Still, the parties agree that the right shoulder strap slipped out of place, although the parties dispute how far it slipped: Hammer says it moved slightly to the side, while defendants maintain that it fell off his shoulder.

Next, Bortz placed Hammer's head in a hold for approximately one minute, but the parties dispute exactly how it played out. According to Bortz, he noticed Hammer manipulating his restraints, and that the right shoulder strap had fallen out of place because of Hammer's movements. Bortz attests that if an inmate frees himself from restraints, the inmate could become dangerous to himself and others, either by flipping the chair with momentum and body weight or arching himself to hit his head on the chair, or he could threaten the safety of staff. With these risks in mind, Bortz attests that he used a trained

4

compliance hold to control Hammer's head by securing Hammer's head backwards. While Hammer maintains that this use of force was unnecessary and excessive, including because Bortz jerked his head backwards and used a "pressure point" hold intended to cause him significant pain, there appears to be no extra movements by Hammer or Bortz from the moment Bortz applies the hold until it is released, as it served the purpose of gaining Hammer's full compliance. Hammer further states that the hold was extremely uncomfortable.

The video footage shows Bortz holding Hammer's chin towards the ceiling by holding his fingers underneath Hammer's jawbone, while simultaneously loudly directing Hammer to stop manipulating his restraints. (*See* Ex. 1004 at 12:40-13:40.) However, the video footage does *not* show how far the shoulder strap fell before Bortz placed him in a hold. Instead, the principal video footage captures Bortz's back, which blocks the majority of the restraint chair. Only when other officers come to Bortz's aid about 6 seconds in does the vantage point change, when that footage shows Hammer from his front. (*See id.* at 12:40-12:50.) By that time, when Bortz already has Hammer in a hold, the right shoulder strap had fallen off completely. Hammer can be heard speaking at that point; but he not say that he was in pain, although he can be heard saying "That's excessive force bitch," and asking about a camera. (*See id.* at 13:05-13:25.)

Lieutenant Olson attests that he did not observe Officer Bortz's initial compliance hold. However, Olson approached Bortz, apparently after hearing Bortz's directives to Hammer, and Olson attests that he observed Bortz using a trained compliance hold to secure Hammer's head while the chair straps were adjusted. Hammer contends not only

5

that Olson saw Bortz place him in the hold, but also that Bortz used an improper pressure point hold. But Hammer cites his own declaration in support, and he does not attest to either observing Olson seeing Bortz initiate the hold or knowledge of compliance or pressure point holds. Therefore, Olson's statements about his observations are undisputed. Olson also attests that because Hammer did not talk about being in pain while he was in the compliance hold, Olson did not believe he needed to intervene to stop Bortz's use of force. For his part, Hammer states that he could not breathe or talk for the first 20-25 seconds of Bortz's hold because Bortz held his thumb over his lips for that period of time.

After the shoulder strap was secured again, Bortz released Hammer. From beginning to end, the entire hold occurred in under one minute. Nevertheless, Hammer immediately started cursing at Olson, stating that excessive force had been used, but there are no visible marks on his neck, nor any other signs of trauma from Olson's brief hold. At most, it appears that Hammer's head and neck had been bent back for less than one minute. Lieutenant Olson then contacted Psychological Services Unit ("PSU") staff, relayed Hammer's statements, and determined that Hammer's situation did not merit clinical observation status. Olson also had two officers independently search Hammer's cell, but neither officer found contraband or a piece of metal. At that point, officers released Hammer from the restraint chair. Hammer then began moving without being directed to move, prompting Olson to tell Hammer that he would be tased if he did not comply, at which point officers, including Bortz, returned Hammer to his cell without further incident. Hammer was placed on control separation status with a paper smock. Neither Officer Bortz nor Lieutenant Olson submitted incident reports about placing Hammer in the

6

restraint chair or the use of the hold. According to defendants, Hammer's records also do not show that he reported any injuries or ask for medical attention related to Bortz's hold, either the day of the incident or subsequently. Nevertheless, Hammer states that he asked to be seen in the health services unit, and he reported injuries to his back and neck pain for a year and a half after this incident, which were ignored. Further, he claims to have suffered emotionally from this incident. Although defendants agree that Hammer has submitted many requests for medical attention for back and neck plain, they point out that Hammer has been complaining about these conditions for many years before this incident.

OPINION

A party is entitled to summary judgment if the movant shows that there is no genuine dispute as to any material fact, and judgment is appropriate as a matter of law. Federal Rule of Civil Procedure 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. If the moving party makes a showing that the undisputed evidence establishes their entitlement to judgment beyond reasonable dispute, then to survive summary judgment, the non-moving party must provide contrary evidence "on which the jury could reasonably find for the nonmoving party." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-407 (7th Cir. 2009) (quoting *Anderson*, 477 U.S. at 252). Moreover, in cases where video evidence is available, "to the extent [plaintiff's] story is 'blatantly contradicted' by the video such that no reasonable jury could believe it, the Seventh Circuit will "not credit his version of events." *Dockery v. Blackburn*, 911 F.3d 458,

461 (7th Cir. 2018) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Defendants seek summary judgment on the merits of plaintiff's claims, as well as on qualified immunity grounds. Because this court will resolve these claims on the merits, beginning with Correctional Officer Bortz, it does not address the question of qualified immunity.

I.   **Officer Bortz**

The Eighth Amendment prohibits the use of excessive force on prisoners. For a plaintiff to succeed on an excessive force claim, however, he must submit evidence that the prison official acted "wantonly or, stated another way, 'maliciously and sadistically for the very purpose of causing harm.'" *Harper v. Albert*, 400 F.3d 1052, 1065 (7th Cir. 2005) (quoting *Wilson v. Seiter*, 501 U.S. 294, 296 (1991)). Relevant factors are: (1) the need for the application of force; (2) the relationship between that need and the amount of force used; (3) the extent of injury inflicted; (4) the extent of threat to the safety of staff and inmates, as reasonably perceived by the responsible officials based on the facts known to them; and (5) any efforts made to temper the severity of a forceful response. *Whitley v. Albers*, 475 U.S. 312, 321 (1986).

Applying these factors, nothing supports a reasonable finding by a trier of fact that Bortz acted with malicious intent to harm Hammer. As for the first factor, while the parties dispute whether there was a need for Bortz to place plaintiff briefly in the chin hold, the hold was necessary from Officer Bortz's reasonable perspective because Hammer had already harmed himself, threatened officers and inmates, and refused to comply with a directive to leave his cell until an immediate threat. Moreover, whether or not sufficient

to justify the control hold, there is *no* dispute that a loosened strap created the *possibility* that Hammer could harm himself or others by flipping the chair. In opposition, plaintiff simply maintains that because he was compliant in the restraint chair, and he had not manipulated the shoulder straps, there was no need for Bortz to apply force.

In fairness to plaintiff, the video footage does not show plaintiff actively attempting to free himself from the shoulder restraint, nor does the footage show how far off plaintiff's shoulder the strap had fallen before Officer Bortz placed him in the hold, but there is no dispute that the shoulder strap had fallen out of place when Bortz employed the hold, nor that an inmate who frees himself from restraints poses a risk of injury to himself or others. Bearing in mind that officers like Bortz are "often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving," *Graham v. Connor*, 490 U.S. 386, 396–97 (1989), no reasonable trier of fact could find fault with Bortz for viewing the loosened strap over Hammer's shoulder as a signal that Hammer may have freed himself and posed a threat under all the undisputed circumstances here. In particular, even assuming that Hammer had calmed down and been compliant once he was in the restraint chair, there is no dispute that moments before that he had been combative and obstinate with the officers, had threatened self-harm, prompting his placement in the restraint chair. Thus, a reasonable officer, including Bortz, had grounds to believe that the loosened strap was a sign that Hammer could get loose, free himself of the restraints, and harm himself or others, or so a reasonable factfinder would have to find.

As for the second factor, the audio and video footage does not support a reasonable finding that Bortz used a disproportionate degree of force relative to the need. Bortz

9

promptly placed Hammer in a hold by pulling his jawbone backwards and upwards with his fingers, until his head rested on top of the restraint chair, using a DOC trained compliance hold. While plaintiff disputes the type of hold Bortz used, characterizing it as a "pressure point" hold, plaintiff submits no evidence as to why he believes this hold was not compliant, including any evidence from himself or someone else with experience identifying security-related holds. Instead, plaintiff maintains that because the hold caused him pain, it was a pressure point hold intended to inflict pain. Plaintiff's speculation does not create a material factual dispute about the nature of Bortz's hold. To the contrary, all of the circumstances suggest otherwise. Bortz kept Hammer in the control hold for just less than one minute, during which Hammer is not seen struggling and can be heard speaking and cursing; at no point does Hammer shout out in pain; nor can Bortz be seen yanking or pulling at Hammer in a way suggesting that he was doing anything other than keeping Hammer's head in place while the shoulder restraints were re-applied; and once the restraints were back in place, Bortz released Hammer consistent with Lieutenant Olson's instructions. Nothing about the video footage indicates that Bortz went further than necessary to ensure that Hammer's head was immobile until the restraints were back in place.

Third, there is some dispute as to the extent of plaintiff's injury, with plaintiff claiming that he was unable to breath for about 25 seconds while in the hold, and that he suffered neck and back pain as a result of the hold. While the court accepts that plaintiff was in pain, plaintiff's ability to continue speaking while in the hold makes this highly unlikely, if not incredible. Moreover, immediately after the hold, plaintiff calmly accused

10

the lieutenant of use of excessive force, but made no specific pain complaints, and there is no record of him seeking out medical attention because of this incident, nor any visible marks on his neck or chin.  Although plaintiff did submit health service requests raising concerns about back and neck pain, he had raised those same concerns even before this alleged injury and offers no medical evidence of a causal link.  Still, this factor militates slightly in plaintiff's favor, but not significantly given the substantial contrary evidence contradicting Hammer's assertions of injury.

The fourth factor works in defendant Bortz's favor as well.  Bortz attests that he was concerned about the risk that Hammer could harm himself or others if he freed himself.  Although plaintiff argues that he did not pose a threat and was simply readjusting his arms, Bortz had every reason to believe that Hammer would attempt to free himself of the restraints given Hammer's recent, disobedience, self-harm and dangerous behavior.

Finally, the fifth factor does not support a finding of excessive force.  The video footage shows a prompt, professional application of a control hold after expressing concerns with plaintiff's movements, no further movement by Bortz or the plaintiff, and that the hold was released once Hammer was again secured in the restraint chair.  Plus, plaintiff has submitted no evidence calling into question whether Bortz had reason to believe that Hammer was secured by the shoulder straps any earlier than when he released him from the hold.

Plaintiff's other arguments in opposition also fail.  For example, he contends that Bortz violated DOC policy by placing him in a hold without warning him first, but the video footage does not reveal whether Bortz's directives occurred just before or right when

Bortz placed Hammer in a hold. Even assuming that Bortz violated DOC policy in failing to warn Hammer verbally before placing him in the hold, a violation of policy alone does not establish a constitutional violation. *See Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 380 (7th Cir. 2017) (failing to follow nurse protocols did not establish an Eighth Amendment violation, since "[n]othing in the U.S. Constitution required [defendant] to follow INDOC's policies."); *Estate of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017) ("An agency's failure to follow its own regulations does not rise to the level of a constitutional violation unless the regulations themselves are compelled by the Constitution.") (citations omitted). Again, the critical inquiry is whether Bortz's actions demonstrated a malicious intent to injure Hammer, rather than to regain control over him. Since there is no dispute that the strap was loose, Bortz's decision to simultaneously place him in a hold and direct him to stop manipulating the straps was a reasonable response to the risk that Hammer would free himself of the straps and injure himself or others.

Plaintiff similarly faults Bortz for failing to create an incident report after the fact. However, at worst, this failure demonstrates a failure to follow policy, not a malicious intent by Bortz to harm Hammer by administering the short compliance hold. For all of these reasons, no reasonable fact-finder could find that Bortz violated Hammer's Eighth Amendment rights by briefly putting him in that hold on November 6, 2018. Therefore, Bortz is entitled to summary judgment on the merits of this claim.

## II.     Lieutenant Olson

A prisoner asserting a failure-to-intervene claim must prove: (1) the officer had reason to know that excessive force was being used; and (2) the officers "had a realistic

opportunity to intervene to prevent the harm from occurring." *Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009) (granting summary judgment on failure to intervene claim where the use of pepper spray was spontaneous and thus completed before bystander prison guards could prevent it); *see also Gill v. city of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017).

Here, neither is true. First, since Bortz did not use excessive force against plaintiff, it follows that Olson is entitled to summary judgment. Second, even if Bortz did something wrong, there is no reasonable dispute that Olson could not have seen that conduct, since his view was no better than any of the multiple video cameras, none of which establish use of excessive force. Therefore, Olson is also entitled to summary judgment on the merits of plaintiff's Eight Amendment claim against him.

ORDER

IT IS ORDERED that:

1. Defendants motion for summary judgment (dkt. #37) is GRANTED.
2. The clerk of court is directed to enter final judgment in defendants' favor.

Entered this 25th day of January, 2023.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge